Filed: August 19, 2004

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 03-10
(CA-00-286-5-H)

EARL RICHMOND, JR.,

                                    Petitioner - Appellant,

        versus

MARVIN L. POLK, Warden, Central Prison,
Raleigh, North Carolina,

                                    Respondent - Appellee.

O R D E R

        The court amends its opinion filed July 20, 2004, as follows:

        On page 11, first full paragraph, line 10; page 20, first paragraph, line 10; and page 17, footnote 5, second paragraph, line 17 -- the date "October 10" is corrected to read "October 8."

        On page 11, first full paragraph, line 13, the word "Also" is deleted from the beginning of the sentence.


                                    For the Court - By Direction


                                    /s/ Patricia S. Connor
                                            Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EARL RICHMOND, JR.,
          *Petitioner-Appellant,*

v.

MARVIN L. POLK, Warden, Central
Prison, Raleigh, North Carolina,
          *Respondent-Appellee.*

No. 03-10

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CA-00-286-5-H)

Argued: May 4, 2004

Decided: July 20, 2004

Before WILKINSON, KING, and GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge King joined.

---

## COUNSEL

**ARGUED:** Ann Elizabeth Groninger, PATTERSON, HARKAVY & LAWRENCE, Raleigh, North Carolina, for Appellant. Diane Appleton Reeves, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Burton Craige, PATTERSON, HARKAVY & LAWRENCE, Raleigh, North Carolina, for Appellant. Roy Cooper,

Attorney General of North Carolina, Raleigh, North Carolina, for Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

Petitioner-appellant Earl Richmond, Jr. was sentenced to death after being found guilty by a North Carolina jury of three counts of first-degree murder and one count of first-degree rape. Following exhaustion of his rights of review in the North Carolina courts, Richmond filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of North Carolina asserting sixteen separate claims. After reviewing the merits of Richmond's claims, the district court granted the State of North Carolina's motion for summary judgment and denied Richmond's habeas petition. The district court thereafter issued Richmond a certificate of appealability for his claims that: (1) the state trial court's *voir dire* questions were constitutionally inadequate under *Morgan v. Illinois*, 504 U.S. 719 (1992); (2) his counsel rendered ineffective assistance during the guilt phase of his trial by failing to present expert and available lay testimony regarding his inability to form the requisite intent for first-degree murder because of his level of intoxication; (3) his counsel rendered ineffective assistance during the penalty phase of his trial by failing to present expert testimony regarding his substance abuse and its effect on his behavior; and (4) the state trial court's denial of his request for an instruction informing the jury of his parole ineligibility for a prior federal murder conviction violated the Supreme Court's holding in *Simmons v. South Carolina*, 512 U.S. 154 (1994). We subsequently issued Richmond a certificate of appealability for his claim that his counsel rendered ineffective assistance during the penalty phase of his trial by failing to (1) retain a sexual abuse expert and (2) request that childhood sexual abuse be presented to the jury as a possible mitigating factor. For the reasons that follow, we affirm the district court's denial of Richmond's habeas petition.

## I.

During the early morning of November 2, 1991, Richmond went to the home of Helisa Hayes,[1] the ex-wife of his best friend, Wayne Hayes, and allegedly engaged in consensual intercourse with her. Thereafter, Richmond and Ms. Hayes allegedly got into an argument about Ms. Hayes flaunting her relationships with other men in front of her ex-husband. During this argument, Richmond, after supposedly being struck with an object by Ms. Hayes, grabbed and carried Ms. Hayes into her bedroom. Once inside of Ms. Hayes' bedroom, Richmond struck Ms. Hayes in the face with his fist and proceeded to engage in "forceful" intercourse with her. After having "forceful" intercourse with Ms. Hayes, Richmond strangled her to death with his hands and poured rubbing alcohol over her vaginal area. Richmond then grabbed Ms. Hayes' eight-year-old son, Phillip, who was laying down in the hallway outside of his mother's bedroom, carried him into the bathroom, stabbed him approximately forty times with scissors and wrapped an electrical cord five times around his neck. After killing Phillip, Richmond went into the bedroom of Ms. Hayes' seven-year-old daughter, Darien, who was sleeping in her bed, and strangled her to death with the cord from a curling iron. Ms. Hayes' father, William Stewart, discovered the bodies of his daughter and two grandchildren on November 4th when, after having not heard from Ms. Hayes for two days, he became concerned about her safety and broke into her home.

Because Richmond was Wayne Hayes' best friend and because he was well acquainted with Ms. Hayes and her children, even serving as a pallbearer at their funerals, police interviewed Richmond, among others, soon after the dead bodies of Ms. Hayes and her two children were discovered. During this initial interview, Richmond told police that he had not been to Ms. Hayes' home during the weekend of the murders. Moreover, Richmond sought to shift attention from himself by telling police that he believed Wayne Hayes had visited Ms. Hayes' home at some point during the weekend in question. Conse-

---

[1]Although the parties spell Ms. Hayes' first name as "Halisa" in their briefs, we spell Ms. Hayes' first name in this opinion as "Helisa" because this is how it is spelled in Richmond's indictment and the opinions rendered by the district court and state courts.

quently, police, rather than considering Richmond a suspect, focused their attention on Ms. Hayes' ex-husband, Wayne Hayes, her boyfriend at the time of the murders, Barrett Parks, and her father, William Stewart. Approximately three months after the murders, however, Richmond became a suspect when his sister, Andrea Knight, informed police that she had dropped Richmond off near Ms. Hayes' home on the early morning of November 2nd after they and others attended an all night house party. In light of this information, police requested a suspect rape kit from Richmond, which revealed, through DNA evidence, that the semen found inside of Ms. Hayes' body belonged to Richmond. Based on this DNA evidence, police brought Richmond in for an interview on April 3, 1992.

During this interview, Richmond, after initially denying any involvement in the murders of Ms. Hayes and her two children, confessed to having committed the murders upon being informed that DNA evidence revealed that his semen was found inside of Ms. Hayes' body. When asked to describe the murders, Richmond told police, in sum, the following:

> At approximately 3:45 a.m. on the morning of November 2nd, he went to Ms. Hayes' home after leaving an all night house party. Upon arriving at Ms. Hayes' home, he and Ms. Hayes got into an argument about her "messing" around on Wayne Hayes. After arguing, he and Ms. Hayes engaged in "forceful" sex and then got into another argument. During this argument, Ms. Hayes struck him with an object and called her son, Phillip, into the room. In response, he knocked Ms. Hayes to the ground by striking her in the face with his fist, grabbed her son, who at this point had entered the room, and took him into the bathroom where he stabbed him to death with scissors. After killing Phillip, he went into the bedroom of Ms. Hayes' daughter, Darien, and strangled her to death with the cord from a curling iron. He then went back into Ms. Hayes' bedroom where he strangled her to death with his hands and poured rubbing alcohol on her vaginal area.

J.A. 346-67 (testimony of Lieutenant Don Smith). During a subsequent interview on April 5th, Richmond, although altering his recol-

lection of the events, confirmed his confession. During this interview, Richmond told police, in sum, the following:

> Upon arriving at Ms. Hayes' home at approximately 3:45 a.m., he engaged in consensual intercourse with Ms. Hayes. After having consensual intercourse, he and Ms. Hayes got into an argument about Ms. Hayes flaunting her relationships with other men in front of Wayne Hayes. During this argument, Ms. Hayes struck him with an object and called her son, Phillip, into the room. In response, he carried Ms. Hayes into her bedroom, struck her in the face with his fist, engaged in "forceful" sex with her, strangled her to death with his hands, and poured rubbing alcohol on her vaginal area. After killing Ms. Hayes, he grabbed her son, who had entered and left the room during the aforementioned events and subsequently laid down in the hallway outside Ms. Hayes' bedroom, and took him into the bathroom where he stabbed him to death with scissors. After killing Ms. Hayes' son, he went into her daughter's bedroom, Darien, and strangled her to death with the cord from a curling iron.

*Id.* at 474-86 (testimony of Captain Art Binder). Based on his April 3rd and 5th confessions, Richmond was indicted on July 6, 1992 for the first-degree rape of Ms. Hayes; the first-degree murder of Ms. Hayes; the first-degree murder of Phillip Hayes; and the first-degree murder of Darien Hayes.

While awaiting trial on these charges, Richmond was charged in the United States District Court for the District of New Jersey with the April 4, 1991 murder of Lisa Ann Nadeau, an army dispersing clerk at the Fort Dix military base. On May 28, 1993, Richmond was convicted of Ms. Nadeau's murder and subsequently sentenced to a term of life imprisonment. Because the Sentencing Reform Act of 1984, Pub. L. No. 98-473, Title II, 98 Stat. 1987, abolished parole for federal offenses committed after November 1, 1987, Richmond is not eligible for parole on this conviction.

After being convicted and receiving a life sentence in federal court for Ms. Nadeau's murder, Richmond was tried during the May 1, 1995 criminal session of the Superior Court for Cumberland County,

North Carolina for the rape and murder of Ms. Hayes and the murders of her two children. Prior to the commencement of Richmond's trial, the court ruled that the State would be allowed to introduce evidence about Richmond's federal conviction for the murder of Ms. Nadeau, as an aggravating factor, during the penalty phase. Consequently, Richmond's attorneys requested the court's permission to ask potential jurors during *voir dire* whether "if . . . knowing that [Richmond] had a previous first-degree murder conviction, they could still consider mitigating circumstances . . . in determining what their ultimate recommendation as to life or death is going to be." *State v. Richmond*, 495 S.E.2d 677, 683 (N.C. 1998). The court denied this request on the basis that it was a "stakeout" question aimed at determining what prospective jurors would do if presented with a certain state of evidence. Moreover, the court noted that Richmond's attorneys could get the information they needed to empanel an impartial jury through broader and more appropriate questions.

At trial, Richmond's attorneys called his two sisters, Sheila Jordan and Erica Richmond, as their sole witnesses. Jordan testified that: (1) Richmond drank beer on a regular basis; (2) she observed Richmond consume about two to three forty-ounce beers prior to attending a house party on the night of November 1st; (3) Richmond consumed a lot of hard liquor, which he did not regularly drink, within the first couple hours of arriving at the party; (4) Richmond drove her to purchase twenty dollars worth of crack cocaine, of which each of them took one hit; (5) Richmond became extremely obnoxious after taking a hit of the crack cocaine, which frightened her because she had never witnessed him have such a reaction to crack cocaine; (6) Richmond, after returning to the party at approximately 1:45 a.m., consumed alcohol for another two hours prior to leaving the party; and (7) she had never observed Richmond consume so much alcohol. Erica Richmond testified that Richmond regularly drank beer and that, although she could not quantify the amount of alcohol that Richmond consumed at the party, she saw Richmond with a glass of alcohol throughout the night.

At the conclusion of Richmond's two day trial, the court held a charge conference. During this conference, the court denied Richmond's request for a voluntary intoxication jury instruction on his three first-degree murder charges because Richmond's attorneys

failed to produce substantial evidence showing that he was "utterly incapable of forming a deliberate and premeditated purpose to kill." *Id.* at 557. Specifically, the court found:

> Assuming arguendo that the Defendant has shown consumption of alcohol and drugs through the testimony of one or more of his own family members, that same evidence also shows an ability of the Defendant to drive an automobile and to follow directions to and from the scene of the party to a locale where drugs apparently were consumed. Later, the Defendant, at his request was dropped off approximately a mile to a mile and a half from the trailer of H[e]lisa Hayes at approximately 3:45 a.m. There now remains a void about the Defendant and his activities after 3:45 a.m. that can be illustrated by a few simple questions: Where did the Defendant go? Did the Defendant go directly to H[e]lisa Hayes' trailer? Did the Defendant stop, rest or sleep before going to the Hayes trailer? How long did it take the Defendant to get to the trailer? Did the Defendant walk? Did the Defendant catch a ride? If the Defendant walked, how long did it take him? What was the time that the Defendant arrived at the Hayes trailer? Did the Defendant arrive a couple of hours later, which would be approximately 5:45 a.m.? The Defendant's various statements contained details and recollections of events that depict a man aware of the events unfolding in the Hayes trailer on the morning hours of that day.

> \* \* \* \*

> The Defendant has a void that has not been filled concerning the state of intoxication at the time of the killings.

*Id.* at 557-59. Nonetheless, Richmond's attorneys were permitted during their closing argument to refer to his alcohol and drug consumption on the night in question, as part of the totality of circumstances surrounding the murders, for the proposition that Richmond was so intoxicated that he could not have premeditated the murders. Consequently, Richmond's attorneys maintained during their closing argument:

> In all three [murder] cases, [Richmond] did not act with pre-meditation and deliberation. Premeditation means to plan an act before, for some period of time, however short. Deliberation means to act in a cool state of mind. And in this case the State has not shown that [Richmond] either planned the events or acted in a cool state of mind.
>
> Let's recount what it shows — the evidence. That night he'd been drinking, been using drugs. You heard the evidence, the testimony of his sisters. The evidence, also, of his drinking and the effects it may have had on him was also shown by his problems with [his] memory about what occurred when he was admitting his involvement in the crime, the problems he had remembering details is evidence of influence of the alcohol and drugs. He gets out of the car that night. There's no evidence at that point that he's planning to harm anyone. He goes out first to see a friend down on Bruce Road. It appears that the last of the many places he went was H[e]lisa Hayes' house. She let him in. They had sex. And then an argument ensued and in the course of that argument she hit him.
>
> That resulted — the combination of the alcohol, the drugs, the anger from the argument and being struck, put into such a rage, a rage that meant that without planning, and certainly never acting in a cool state of mind, these events happened. There is no evidence to prove that he acted in a cool state of mind when this occurred.

*Id.* at 573-75.

In response, the State asserted in its closing argument that there was sufficient evidence to establish beyond a reasonable doubt that Richmond acted with premeditation and deliberation. In particular, the State argued that Richmond went to Ms. Hayes' home at 3:45 a.m. with the sole purpose of raping her, and that once he murdered her, he purposely searched out her children, even going through the house looking for a weapon, and killed them so as to ensure that there would be no witnesses. After both sides completed their closing arguments and rested, the court instructed the jury on each count.

On May 24, 1995, after deliberating for a short period, the jury found Richmond guilty of the first-degree rape of Ms. Hayes and the first-degree murders of Ms. Hayes and her two children. After the jury rendered its guilty verdict, the court scheduled Richmond's sentencing hearing for the following day. Prior to and during this hearing, Richmond's attorneys moved to have the jury informed that Richmond was not eligible for parole on his federal conviction for the murder of Ms. Nadeau given that the State intended to introduce evidence of his conviction as an aggravating factor. The court denied Richmond's motions on the basis that North Carolina law, as determined by the North Carolina Supreme Court, does not allow jurors to consider parole eligibility when making sentencing decisions.

At the commencement of Richmond's sentencing hearing, the prosecution introduced into evidence a certified copy of Richmond's federal murder conviction. In addition, the prosecution called Ms. Nadeau's father, Arthur Nadeau, as a witness. Mr. Nadeau testified that Richmond strangled his daughter to death with his hands as he had with Ms. Hayes. The prosecution also called Art Binder, one of the Cumberland County Sheriffs who conducted Richmond's April 5th interview, as a witness.

Richmond's trial counsel called eight witnesses during his sentencing hearing: Andrea Knight (Richmond's sister); Woodrow Rowell (prison GED instructor); Lieutenant Darryl Morin (jailer); Franklin York (Director of Prison Ministries); Robin Monita, Jr. (Richmond's friend from his military service); Dr. John Warren (forensic psychologist); and Dr. Billy Royal (forensic psychiatrist). Knight testified that Richmond was: (1) an alcoholic who had been introduced to drinking at an early age by their alcoholic father; (2) drinking alcohol, although she was uncertain as to whether it was hard liquor, at the November 1st party; and (3) acting wild and differently, which could have been due to the alcohol or the party atmosphere. Monita testified that Richmond drank all the time while in the military, went from an easy going person to someone easily angered when under the influence of hard liquor, and that people stayed away from him when they knew he was drinking hard liquor. Rowell, York and Lieutenant Morin testified that Richmond had not been cited for any disciplinary infractions while in prison.

Drs. Warren and Royal testified that Richmond suffered from severe personality disorders and chronic depression, grew up in a dysfunctional family and suffered from mixed substance abuse disorder. They also testified that Richmond's father was violent and aggressive, an alcoholic, had numerous affairs and introduced Richmond to sex and alcohol at a young age. Due to all these factors, they concluded that Richmond had a deep-seated anger, no sense of self, was isolated from his feelings, had a diminished capacity to control his behavior outside of a structured environment, and had a diminished capacity to appreciate the criminality of his conduct and conform his behavior to the requirements of the law.

To rebut the expert testimony of Drs. Warren and Royal, the State called Dr. Louis Schlesinger, a forensic psychologist, and Dr. Daniel Greenfield, a forensic psychiatrist, as witnesses. Dr. Schlesinger testified that Richmond's conduct on the night of the murders, despite his severe personality disorder and likely drug and alcohol consumption, was goal-oriented and thoughtful. Dr. Schlesinger also testified that Richmond clearly had the ability to appreciate the criminality of his conduct and conform to the requirements of the law. Moreover, Dr. Schlesinger described to the jury Richmond's recollection of the Nadeau and Hayes murders. Dr. Greenfield testified that Richmond's behavior on the night of the Hayes murders, irrespective of his likely drug and alcohol consumption, was purposeful, goal-oriented, knowing and sophisticated. Dr. Greenfield also testified that Richmond's murder of Ms. Nadeau required complex, goal-oriented and sophisticated behavior.

In its closing argument during Richmond's sentencing hearing, indeed its very last statement to the jury, the State argued:

> When you know that someone has killed not just once, Lisa Ann Nadeau, not just twice, H[e]lisa Hayes, not just three times, Darien Hayes, not just four times, Phillip Hayes. Four times, folks. What does it take? What does it take? There is only one way you can ensure that this defendant does not kill again, and that is to impose the penalty that he has earned and worked for and deserves. I ask you to impose the death penalty on all three cases.

*Richmond*, 495 S.E.2d at 696. After finding the existence of three aggravating factors, including Richmond's federal murder conviction, and five mitigating factors,[2] the jury imposed a death sentence for each of Richmond's murder convictions and a life sentence for his rape conviction.

On direct appeal, the North Carolina Supreme Court held, among other things, that the trial court did not violate Richmond's rights under *Morgan* and *Simmons*. *Id.* at 684, 696. On October 5, 1998, the United States Supreme Court denied Richmond's petition for a writ of certiorari. *Richmond v. North Carolina*, 525 U.S. 843, *reh'g denied*, 525 U.S. 1034 (1998). On September 13, 1999, Richmond filed a motion for appropriate relief ("MAR") in the Cumberland County Superior Court asserting several ineffective assistance of counsel claims arising out of both the guilt and penalty phases of his trial. On October 8, 1999, the State filed a response requesting that Richmond's MAR be denied on the pleadings because the claims asserted therein were both procedural defaulted and without merit. On October 10th, Richmond filed two motions seeking (1) the appointment of Dr. Roy Matthew, a psychiatrist specializing in addiction medicine, as an expert to assist his counsel in developing evidence about the effects of his substance abuse, and (2) additional expenditures for Dr. David Lisak, a sexual abuse expert who was investigating Richmond's possible childhood sexual abuse. On October 12th, the Cumberland County Superior Court granted both motions.

On November 22, 1999, the Cumberland County Superior Court denied Richmond's MAR on the pleadings after concluding that his ineffective assistance of counsel claims were both procedurally defaulted and without merit. The following day, not yet aware of the denial of his MAR, Richmond filed an amendment to his MAR, to

---

[2]Out of the thirty mitigating factors presented by Richmond's trial counsel, the jury found the following mitigating factors: (1) Richmond committed the crimes while suffering from mental or emotional disturbance; (2) Richmond committed the crimes while under the influence of alcohol; (3) Richmond suffers from severe personality disorder; (4) Richmond's use of alcohol and drugs had an effect on his behavior; and (5) Richmond's father mentally abused him.

which he attached an affidavit from his trial counsel, Jonathan Broun. On December 2nd, Richmond filed a motion for reconsideration of the order denying his MAR, asking that the court consider Broun's affidavit. On December 10th, the Cumberland County Superior Court summarily denied Richmond's motion for reconsideration. On December 14th, Richmond filed a supplemental motion for reconsideration upon which the Cumberland County Superior Court did not rule. Richmond then filed a petition for a writ of certiorari in the North Carolina Supreme Court. This petition was denied on April 6, 2000.

On April 28, 2000, Richmond filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of North Carolina. In his habeas petition, Richmond asserted sixteen separate claims. On January 13, 2003, the district court, after reviewing the merits of Richmond's claims, granted the State's motion for summary judgment and dismissed Richmond's habeas petition. On May 1, 2003, the district court denied Richmond's Rule 59(e) motion. On July 1, 2003, the district court granted Richmond a certificate of appealability on his claims that: (1) the state trial court's *voir dire* questions violated *Morgan*; (2) he received ineffective assistance during the guilt phase of his trial when his trial counsel failed to present expert and available lay testimony regarding the effects that his drug and alcohol consumption had on his ability to form the requisite intent for first-degree murder; (3) he received ineffective assistance during the penalty phase of his trial when his trial counsel failed to present expert testimony regarding his substance abuse and its effect on his behavior; and (4) the state trial court erred by denying his requests for a *Simmons* instruction. On December 17, 2003, Richmond, after having submitted his opening brief with this Court, filed an unopposed motion pursuant to our local rules, specifically Local Rule 22(c)(2)(B), seeking to extend the time to file a request to expand his certificate of appealability to include three additional claims rejected by the district court. We subsequently granted Richmond's motion to extend time and issued him a certificate of appealability for one of his claims. Specifically, we issued Richmond a certificate of appealability for his claim that his trial counsel rendered ineffective assistance during the penalty phase of his trial by failing to (1) retain a sexual abuse expert and (2) request that

childhood sexual abuse be presented to the jury as a possible mitigating factor.

## II.

"We review *de novo* a district court's decision on a petition for writ of habeas corpus based on a state record." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999). However, because Richmond's habeas petition was filed on April 28, 2000, after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), our *de novo* review is constrained by the standards sets forth by AEDPA. Under AEDPA, if a state court has resolved the merits of a claim for post-conviction relief, as is the case here, we may issue a writ of habeas corpus only if the state court's holding "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).

In the present case, our inquiry focuses on whether the state court's adjudication of Richmond's claims "was contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* § 2254(d)(1). To grant Richmond's habeas petition, we need not find that the state court's adjudication of his claims was both "contrary to" and an "unreasonable application" of clearly established federal law because these clauses, as interpreted by the Supreme Court, have independent meanings. *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). A state court decision is contrary to clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision constitutes an unreasonable application of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Id.* A state court's erroneous or incorrect application of clearly established federal law, however, does not constitute an unreasonable application because an

"*unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. Thus, the state court's erroneous or incorrect application of federal law "must also be unreasonable." *Id.* at 411.

III.

Richmond raises three distinct ineffective assistance of counsel claims. First, Richmond argues that his trial counsel rendered ineffective assistance during the guilt phase of his trial by failing to present expert and available lay testimony, other than that of his two sisters, in support of his defense that he was too intoxicated to premeditate the murders of Ms. Hayes and her two children. Richmond asserts that his trial counsel's failure to present this additional testimony prevented him from receiving a voluntary intoxication jury instruction. Second, Richmond argues that his trial counsel rendered ineffective assistance during the penalty phase of his trial by failing to present expert testimony regarding his substance abuse and its effect on his behavior. Richmond contends that a substance abuse expert would have testified that although he was able to control the rage generated by his childhood sexual abuse when sober,[3] he could not do so when under the influence of drugs and alcohol. Third, Richmond's habeas counsel argues that his trial counsel rendered ineffective assistance during the penalty phase of his trial by failing, upon being informed by one of his sisters that she believed Richmond may have been sexually abused by their father, to (1) retain a sexual abuse expert and (2) request that childhood sexual abuse be presented to the jury as a possible mitigating factor.

The Cumberland County Superior Court, in denying Richmond's MAR, held that Richmond's first two ineffective assistance of counsel claims were procedurally defaulted under N.C. Gen. Stat. § 15A-

---

[3]We note that Richmond himself has never asserted that he was sexually abused as a child. Indeed, Richmond stated during an interview with Dr. Lisak, the sexual abuse expert retained by his habeas counsel, that he did not recall being sexually abused as a child. Instead, this claim has been put forth by Richmond's habeas counsel based on the fact that one of Richmond's sisters informed his trial counsel that she believed their father may have molested Richmond as a child.

1420(b)(1) because he failed to support these claims with an affidavit or other documentary evidence.[4] The Cumberland County Superior Court held that Richmond's third ineffective assistance of counsel claim, although accompanied by an affidavit from Dr. Lisak, was procedurally defaulted under N.C. Gen. Stat. § 15A-1420(b)(1) because Dr. Lisak's affidavit did not actually support Richmond's claim. The Cumberland County Superior Court concluded that Dr. Lisak's affidavit did not support Richmond's claim because, in addition to containing cumulative speculation, it acknowledged that Richmond did not recall being sexually abused as a child by his father and that Richmond's father adamantly denied sexually abusing him. As an alternate basis for denying Richmond's MAR, the Cumberland County Superior Court, after reviewing Richmond's ineffective assistance of counsel claims, held that they lacked any merit.

## A.

Under the procedural default doctrine, federal habeas review of federal claims defaulted by prisoners in state court "pursuant to an independent and adequate state procedural rule . . . is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "The procedural default doctrine and its attendant cause and prejudice standard are grounded in concerns of comity and federalism and apply alike whether the default in question occurred at trial, on appeal, or on state collateral attack." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)(internal citation and quotation marks omitted). In addition to showing "due regard for States' finality and comity interests," *Dretke v. Haley*, ___ U.S. ___, 124 S.Ct. 1847, 1852 (2004), the procedural default doctrine's cause and prejudice standard, by allowing federal courts to consider certain procedurally defaulted claims, also serves to ensure "that 'fundamental fairness [remains] the central concern of the writ of habeas cor-

---

[4]Section 15A-1420(b)(1) provides that "[a] motion for appropriate relief after the entry of judgment must be supported by affidavit or other documentary evidence if based upon the existence or occurrence of facts which are not ascertainable from the records and any transcripts of the case or which are not within the knowledge of the judge who hears the motion." N.C. Gen. Stat. § 15A-1420(b)(1).

pus.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 697 (1984)). Thus, to further ensure "that 'fundamental fairness [remains] the central concern of the writ of habeas corpus,'" *id.*, the Supreme Court has recognized a "fundamental miscarriage of justice" exception to the procedural default doctrine's cause requirement. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Under this narrow exception to the cause requirement, federal habeas courts may consider a federal claim procedurally defaulted in state court "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke*, ___ U.S. at ___, 124 S.Ct. at 1852. In the context of capital sentencing, a habeas petitioner can make a showing of "actual innocence," and thus qualify for the "fundamental miscarriage of justice" exception, by putting forth "'clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

Therefore, the procedural default doctrine, as developed by the Supreme Court, allows for habeas review of federal claims defaulted in state court pursuant to an adequate and independent state procedural rule where a petitioner can show (1) cause for the default and prejudice therefrom or (2) that failure to consider the claims will result in a fundamental miscarriage of justice. With this in mind, we must first determine whether N.C. Gen. Stat. § 15A-1420(b)(1) constitutes an independent and adequate state procedural rule and, if so, whether Richmond can demonstrate that his failure to comply with it should be excused under the cause and prejudice or fundamental miscarriage of justice exceptions to the procedural default doctrine.

### B.

A state procedural rule is "adequate" if it is firmly established and regularly or consistently applied by the state court, *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988), and "independent" it if does not depend on a federal constitutional ruling. *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). Here, we find that N.C. Gen. Stat. § 15A-1420(b)(1) is an adequate state procedural rule because "an unambiguous court rule such as [N.C. Gen. Stat. § 15A-1420(b)(1)] is necessarily 'firmly established,'" *Weeks v. Angelone*, 176 F.3d 249, 270 (4th Cir. 1999),

and because North Carolina courts regularly and consistently applied it prior to denying Richmond's MAR for noncompliance with its evidentiary requirement.[5] *State v. Ware*, 482 S.E.2d 14, 16 (N.C.App.

---

[5]Although Richmond does not argue that N.C. Gen. Stat. § 15A-1420(b)(1) is not an adequate state procedural rule, he does argue that "[t]he haphazard manner in which [his] ineffective assistance claims were procedurally defaulted cannot be an adequate state ground to prevent relief." Br. for Appellant at 37. Richmond asserts that his ineffective assistance of counsel claims were haphazardly found to be defaulted because the Cumberland County Superior Court was not precluded from granting his motion to reconsider the denial of his MAR once he cured his procedural default by submitting an affidavit from his trial counsel. Richmond further asserts that his ineffective assistance of counsel claims were haphazardly found to be defaulted because his attorneys reasonably believed that the Cumberland County Superior Court would not rule on his MAR prior to the necessary affidavits being submitted given that (1) the court granted Richmond's motions requesting the appointment of Dr. Matthew and additional expenditures for Dr. Lisak and (2) North Carolina courts have, on at least one occasion, taken up to a year and a half to rule on a MAR. For the reasons that follow, we find Richmond's arguments without merit.

First, the decision of whether to grant Richmond's motion for reconsideration of his procedurally defaulted MAR was completely within the discretion of the Cumberland County Superior Court. Richmond has not argued before us that the Cumberland County Superior Court exercised this discretion in a constitutionally impermissible manner. Rather, he has simply contended that the Cumberland County Superior Court should have granted his motion for reconsideration of his procedurally defaulted MAR because "[t]here was no reason for [the court] not to have reconsidered [its] ruling in light of [his trial counsel's] affidavit." *Id.* at 36. This is not a valid basis for challenging in federal court a state court's decision not to reconsider a motion defaulted under an adequate and independent state procedural rule. Second, once Richmond filed his MAR and the State was given an opportunity to respond, the Cumberland County Superior Court was free to rule on Richmond's MAR at any time. Indeed, Richmond was effectively placed on notice that his MAR could be declared procedurally defective when the State moved, on October 8, 1999, to have his MAR denied because, among other things, it failed to comply with N.C. Gen. Stat. § 15A-1420(b)(1). Consequently, Richmond had approximately six weeks before the Cumberland County Superior Court denied his MAR to cure his procedural default or move for additional time to submit the necessary affidavits.

1997)(stating that N.C. Gen. Stat. § 15A-1420(b)(1) requires that MARs "be accompanied by affidavits or other documentary evidence necessary to support defendant's contention"); *State v. Payne*, 325 S.E.2d 205, 219 (N.C. 1985)(declining to "address the merits of defendant's [MAR]" because N.C. Gen. Stat. § 15A-1420(b)(1), "which governs the procedure for filing a [MAR] clearly requires supporting affidavits to accompany the motion"); *State v. Parker*, 300 S.E.2d 451, 453 (N.C.App. 1983)(holding that MAR was properly denied because defendant failed to submit supporting affidavit or other documentary evidence as required by N.C. Gen. Stat. § 15A-1420(b)(1)); *cf. State v. Harding*, 429 S.E.2d 416, 422-25 (N.C.App. 1993)(considering and denying MAR accompanied by affidavit); *State v. Nickerson*, 359 S.E.2d 760, 763-64 (N.C. 1987)(same); *State v. Clark*, 308 S.E.2d 913, 916-19 (N.C.App. 1983)(same), *disc. review denied*, 315 S.E.2d 693 (1984). We also find that N.C. Gen. Stat. § 15A-1420(b)(1) is an independent state procedural rule given that it does not depend on any federal constitutional ruling.[6]

## C.

Having found N.C. Gen. Stat. § 15A-1420(b)(1) to be an adequate and independent state procedural rule, we now turn to whether Richmond's failure to comply with its evidentiary requirement should be excused. Because Richmond does not argue that our failure to entertain his ineffective assistance of counsel claims will result in a fundamental miscarriage of justice, we focus solely on whether Richmond can "demonstrate cause for [his] default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750.

---

[6]We reject Richmond's alternative argument that he complied with N.C. Gen. Stat. § 15A-1420(b)(1) by filing a verified MAR. Richmond has not brought to our attention, nor have we found, any North Carolina cases holding that a verified MAR satisfies the evidentiary requirement of N.C. Gen. Stat. § 15A-1420(b)(1). The fact that North Carolina courts have held that verified pleadings satisfy the evidentiary requirement of other procedural rules does not compel an opposite conclusion because it is well within the purview of state courts to interpret individual state procedural rules, which may serve distinct purposes, as they see fit.

To establish cause, Richmond must "show that some objective factor external to the defense impeded counsel's efforts to comply with [N.C. Gen. Stat. § 15A-1420(b)(1)]," such as "some interference by officials [that] made compliance impracticable." *Murray*, 477 U.S. at 488 (internal citation and quotation marks omitted). Richmond contends that the Cumberland County Superior Court caused his procedural default under N.C. Gen. Stat. § 15A-1420(b)(1) because the "lack of an affidavit from an expert witness resulted from the court's failure to allow [him] sufficient opportunity to obtain the assistance of the [sex and substance abuse] experts . . . [it] had appointed." Br. for Appellant at 31. Richmond also argues that the Cumberland County Superior Court caused his procedural default under N.C. Gen. Stat. § 15A-1420(b)(1) because it denied his MAR "without notice that a ruling was imminent." *Id.* We reject both of these arguments.

With regard to Richmond's first argument, we find that the Cumberland County Superior Court provided Richmond sufficient time to work with, and obtain an adequate affidavit from, his sexual abuse expert, Dr. Lisak. As noted in Dr. Lisak's affidavit, the Cumberland County Superior Court granted Richmond's motion for his appointment in April 1999. Consequently, Richmond had approximately five months before filing his MAR on September 13, 1999 to obtain an adequate affidavit from Dr. Lisak. If this was an insufficient period for Dr. Lisak to conduct his investigation and prepare an adequate affidavit then Richmond should have waited to file his MAR. Thus, Richmond's inability to obtain an adequate affidavit from Dr. Lisak was caused by his decision, without the court's prompting, to file his MAR knowing that Dr. Lisak's investigation into his possible childhood sexual abuse was not yet complete. Likewise, we find that Richmond's inability to obtain an affidavit from his substance abuse expert, Dr. Matthew, was caused solely by Richmond's decision not to move for the appointment of Dr. Matthew until approximately one month after he filed his MAR. Richmond could have ensured that he had adequate time to obtain an affidavit from Dr. Matthew by moving to have Dr. Matthew appointed, as he did with Dr. Lisak, prior to filing his MAR. Once Richmond filed his MAR and the State responded, the Cumberland County Superior Court was under no duty to postpone its ruling until Richmond obtained and submitted an affidavit from Dr. Matthew.

With regard to Richmond's second argument, the Cumberland County Superior Court was not obligated to notify him that it was preparing to rule on his MAR. Upon receiving the State's response, the Cumberland County Superior Court, irrespective of the fact that it granted Richmond's motions seeking the appointment of Dr. Matthew and additional expenditures for Dr. Lisak, was free to rule on Richmond's MAR at any moment. Moreover, as we previously noted, Richmond received constructive notice that his MAR could be denied for failure to comply with N.C. Gen. Stat. § 15A-1420(b)(1) when the State moved on October 8, 1999 to have his MAR denied on this basis. Pursuant to this constructive notice, Richmond had approximately six weeks before his MAR was denied to cure his procedural default or request additional time to submit the necessary affidavits. Having failed to do so, Richmond cannot now argue that the Cumberland County Superior Court caused his procedural default by not notifying him of its intent to rule on his MAR.

Even if we were to agree with Richmond that cause exists to excuse his procedural default, we conclude, as explained below, that Richmond is unable to show that he was actually prejudiced by his trial counsel's alleged ineffectiveness.[7]

---

[7]In concluding that Richmond cannot establish actual prejudice to excuse his procedural default, we note that there is a question as to "whether the showing of prejudice required to excuse procedural default is identical to the showing of prejudice required to establish ineffective assistance of counsel, namely, that 'there is a reasonable probability that, but for the [errors], the result of the proceeding would have been different.'" *Burket v. Angelone*, 208 F.3d 172, 189 n.17 (4th Cir. 2000)(quoting *Strickland*, 466 U.S. at 694); *see also Williams v. French*, 146 F.3d 203, 210 n.10 (4th Cir. 1998), *cert. denied*, 525 U.S. 1155 (1999)(noting uncertainty as to whether showing of actual prejudice to excuse procedural default is the same as showing of actual prejudice to establish ineffective assistance of counsel under *Strickland*); *United States v. Dale*, 140 F.3d 1054, 1056 n.3 (D.C. 1998)(same); *United States v. Walling*, 982 F.2d 447, 449 (10th Cir. 1992)(same). We need not resolve this question in the present case, however, because Richmond is unable to satisfy either standard.

1.

Richmond first asserts that his trial counsel rendered ineffective assistance during the guilt phase of his trial by failing to present the testimony of a substance abuse expert, such as Dr. Matthew, and his military friend, Monita. Richmond contends that his trial counsel's failure to present this testimony prevented him from receiving a voluntary intoxication jury instruction on his three first-degree murder charges. Because this claim arises out of the guilt phase of his trial, Richmond must establish actual prejudice by showing "'not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *McCarver v. Lee*, 221 F.3d 583, 592 (4th Cir. 2000)(quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). Richmond is unable to make such a showing.

The Cumberland County Superior Court, after hearing the testimony of Richmond's two sisters regarding his drug and alcohol consumption on the night of the murders and its effect on his behavior, denied Richmond's request for a voluntary intoxication jury instruction because he failed to make the requisite showing that he was utterly incapable of forming a deliberate and premeditated purpose to kill at the time that he murdered Ms. Hayes and her two children. The court based this decision on the fact that Richmond failed to establish that he went to Ms. Hayes' home immediately after leaving the party and thus had not sobered up prior to committing the murders. Richmond's inability to establish this key fact, the court reasoned, did not allow for the conclusion that he was still under the influence of alcohol and crack cocaine, to the point where he could not formulate the requisite intent for first-degree murder, at the time that he killed Ms. Hayes and her two children. The court also noted that Richmond's detailed recollection of the murders undercut his argument that his alcohol and crack cocaine consumption prevented him from being able to premeditate and deliberate the murders. On direct review, the North Carolina Supreme Court agreed, holding that Richmond was unable to make "the necessary showing that he was 'utterly incapable' of forming the requisite intent [for first-degree murder]" because "there [was] little evidence of the degree of his intoxication at the time of the murders." *Richmond*, 495 S.E.2d at 688. Neither the

expert testimony of Dr. Matthew nor the lay testimony of Monita would have aided Richmond in making this showing because they were not present on the night of the murders and thus could not testify about Richmond's activities after he left the house party or that the effects of Richmond's drug and alcohol consumption had not worn off prior to his murdering Ms. Hayes and her two children. This is reflected in Richmond's brief, which argues that Dr. Matthew "could have testified based on his investigation that [Richmond] 'consumed vast quantities of alcohol — at least 20 beers and a fifth of liquor — while eating only a sandwich . . . [and that] [h]e also consumed a substantial amount of cocaine,'" which "released [Richmond's] intense, underlying rage in a disastrous manner." Br. for Appellant at 41 (quoting J.A. 1711.134-64 ¶ 10). In addition to not helping Richmond make the requisite showing for a voluntary intoxication jury instruction, this proposed testimony simply repeats the information that was before the Cumberland County Superior Court, through the testimony of Richmond's two sisters, when it denied Richmond's request for a voluntary intoxication jury instruction.

2.

Richmond also argues that his trial counsel rendered ineffective assistance during the penalty phase of his trial by failing to have a substance abuse expert testify about the effect that his drug and alcohol abuse has on his behavior. Richmond asserts that a substance abuse expert would have explained to the jury that he is unable to control the rage generated by his childhood sex abuse when under the influence of drugs and alcohol.[8] Because this claim arises out of the sentencing phase of his trial, Richmond must establish actual prejudice by showing that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Glover v. Miro*,

---

[8]As previously noted, Richmond himself has never asserted that he was sexually abused as a child. *See supra* at 14 n.3. Rather, this is a claim that Richmond's habeas counsel has put forth in light of the fact that one of Richmond's sisters informed his trial counsel that she believed their father may have molested Richmond.

262 F.3d 268, 275 (4th Cir. 2001)(quoting *Strickland*, 466 U.S. at 694). After reviewing the testimony presented by Richmond's trial counsel during both the guilt and penalty phases, we find that Richmond's substance abuse and its effect on his behavior was sufficiently put before the jury. Accordingly, we are confident that there is no reasonable probability that the testimony of a substance abuse expert would have caused the jury to determine that a death sentence on each of Richmond's three first-degree murder convictions was not warranted.

During the guilt phase of Richmond's trial, the jury heard the testimony of Richmond's two sisters, Sheila Jordan and Erica Richmond. As detailed above, they testified at length about Richmond's drug and alcohol consumption on the night of the murders and how they became frightened by how aggressive he became as a result. During the penalty phase of Richmond's trial, the jury heard the expert testimony of Dr. Royal, a forensic psychiatrist, and Dr. Warren, a forensic psychologist. As discussed above, Drs. Royal and Warren testified in detail about Richmond's substance abuse and how it, among other things, caused him to have a diminished capacity to (1) control his behavior outside of a structured environment, (2) appreciate the criminality of his conduct and (3) conform his behavior to the requirements of the law. Moreover, during Richmond's sentencing hearing, the jury heard the testimony of his sister, Andrea Knight, whose testimony was credible given that her call to police lead to Richmond's arrest. Knight testified that Richmond was an alcoholic who had been introduced to alcohol and sex at a young age by their alcoholic father. Lastly, the jury heard the testimony of Richmond's military friend, Monita, who described Richmond's alcoholism in the military and the effect that it had on his behavior.

As a result of this testimony, the jury found, as mitigating factors, that Richmond murdered Ms. Hayes and her two children while under the influence of alcohol and that Richmond's use of alcohol and drugs had an effect on his behavior. Nonetheless, the jury, after weighing these and three additional mitigating factors against three aggravating factors, decided to impose a death sentence on each of Richmond's three first-degree murder convictions. We do not believe that there is a reasonable probability that the testimony of a substance abuse expert, whose testimony was likely to repeat much of what the jury

heard through other witnesses, would have resulted in the jury balancing differently the mitigating and aggravating factors and concluding that a death sentence was not warranted.

3.

Lastly, Richmond's habeas counsel argues that his trial counsel rendered ineffective assistance during the penalty phase of his trial by failing, upon being informed by one of his sisters that she believed he may have been sexually abused by their father, to retain a sexual abuse expert and request that childhood sexual abuse be presented to the jury as a potential mitigating factor. Richmond's habeas counsel asserts that a sex abuse expert would have explained to the jury how childhood sexual abuse causes people to commit violent crimes. According to Richmond's habeas counsel, this testimony, had it been presented, would have allowed the jury to find childhood sexual abuse as a mitigating factor and therefore provided it with an additional basis upon which to decline to impose the death penalty.

Because this claim arises out of the penalty phase of Richmond's trial, he must establish actual prejudice, as previously noted, by showing "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Such a showing cannot be made. Even if Richmond's trial counsel had retained a sexual abuse expert and requested that childhood sexual abuse be presented to the jury as a possible mitigating factor, there does not exist a reasonable probability that the jury would have found childhood sexual abuse as a mitigating factor and as a result declined to impose a death sentence. First, Richmond's sister only asserted that she *believed*, not knew, that their father sexually abused Richmond. Second, this belief has never been substantiated by any witnesses or independent evidence, such as medical or school records. Third, Richmond himself has stated that he does not recall being sexually abused by his father. Lastly, Richmond's father has vehemently denied ever sexually abusing him. Based on these facts, we find that Richmond was not actually prejudiced by his trial counsel's failure to (1) retain a sexual abuse expert and (2) request that childhood sexual abuse be put before the jury as a potential mitigating factor.

## D.

For the reasons stated above, we find that Richmond's three ineffective assistance of counsel claims were procedurally defaulted in state court, pursuant to an independent and adequate state procedural rule, and that Richmond has failed to establish cause or actual prejudice to excuse his procedural default.

## IV.

We now turn to Richmond's argument that under the Supreme Court's holding in *Morgan* he was entitled to ask prospective jurors at *voir dire* whether, once informed that he had previously been convicted of first-degree murder, they would still be able to consider mitigating factors and impose a life sentence.

## A.

The Sixth and Fourteenth Amendments "guarantee[ ] a defendant on trial for his life the right to an impartial jury." *Morgan*, 504 U.S. at 728. This right extends to the sentencing phase, where a capital defendant has the right to be sentenced by jurors who do not believe that "death should be imposed *ipso facto* upon conviction of a capital offense." *Id.* at 735. To allow capital defendants to enforce this right, the Supreme Court held in *Morgan v. Illinois* that "[a] defendant on trial for his life must be permitted on *voir dire* to ascertain whether his perspective jurors," *id.* at 735-36, would vote to "impose death regardless of the facts and circumstances of conviction." *Id.* at 735. Consequently, capital defendants must be afforded an adequate opportunity at *voir dire* to assess a prospective juror's views on capital punishment and whether, in light of these views, he or she would be able to follow the court's instructions and his or her oath.[9] *Id.* at 733-36.

---

[9]Similarly, the Supreme Court has held that "the State may exclude from capital sentencing juries that 'class' of veniremen whose views would prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths." *Wainwright v. Witt*, 469 U.S. 412, 424 n.5 (1985). Accordingly, the State, like capital defendants, "must be given the opportunity to identify such prospective jurors by questioning them at *voir dire* about their views of the death penalty." *Lockhart v. McCree*, 476 U.S. 162, 170 n.7 (1986).

B.

In the present case, Richmond's trial counsel sought to ask prospective jurors the following question at *voir dire*: "[I]f . . . knowing that [the defendant] had a previous first-degree murder conviction, could they still consider mitigating circumstances . . . in determining their ultimate recommendation as to life or death." *Richmond*, 495 S.E.2d at 683. The trial court denied this request, finding that it was a "stakeout" question aimed at determining a prospective juror's answers to legal questions before being informed of the legal principles applicable to their sentencing recommendation. Instead, the trial court allowed Richmond's trial counsel "to ask broad questions about whether they can consider any and all aggravating circumstances and balance that against any and all mitigating circumstances, whatever they may be." *Id.* On direct appeal, the North Carolina Supreme Court concluded that Richmond's proposed *voir dire* question was a "stakeout" question because it sought to "discover in advance what a prospective juror's decision will be under a certain state of the evidence . . . [and] how a certain set of facts would affect his or her decision." *Id.* Because it concluded that Richmond's proposed *voir dire* question was a "stakeout" question, the North Carolina Supreme held that the trial court did not violate *Morgan* by not allowing Richmond to pose this question to prospective jurors because "*Morgan* does not require that a defendant be allowed to ask stake-out questions." *Id.* at 684. "Stakeout" questions, the court reasoned, are not required by *Morgan* because they seek to cause prospective jurors to pledge themselves to a future course of action and "indoctrinate [them] regarding potential issues before the evidence has been presented and [they] have been instructed on the law." *Id.* at 683. Accordingly, the North Carolina Supreme Court held that the trial court complied with *Morgan* by "properly refus[ing] to allow questioning about [Richmond's] prior first-degree murder conviction, while allowing [him] to ask prospective jurors whether they would be able to consider all aggravating and mitigating circumstances." *Id.* at 684.

C.

We find that the North Carolina Supreme Court's decision was neither "contrary to" nor "an unreasonable application" of *Morgan*. As noted by the North Carolina Supreme Court, *Morgan* does not require

that a capital defendant be allowed to determine at *voir dire* what a prospective juror's sentencing decision will be if presented with a specific state of evidence or circumstances. Rather, *Morgan* requires that a capital defendant be afforded an adequate opportunity at *voir dire* to identify prospective jurors "who, even prior to the State's case in chief, [have] predetermined . . . to impose the death penalty." 504 U.S. at 736. Consequently, the Supreme Court's holding in *Morgan* mandates that a capital defendant be allowed to make an essential inquiry at *voir dire*: "the [prospective] jurors' ability to give due consideration to mitigating evidence at sentencing." *Oken v. Corcoran*, 220 F.3d 259, 274 (4th Cir. 2000)(Michael, J., concurring). Here, Richmond was allowed to make this essential inquiry. At *voir dire*, Richmond was able to ask prospective jurors questions such as:

1.  Have you given much thought to the idea of the death penalty before you were called [into] court this week? J.A. 104.

2.  If the circumstances that were argued in mitigation were not circumstances that would legally justify the killing, would you be able to give consideration to those mitigating circumstances? *Id.* at 107.

3.  As you sit there right now, and understanding that you don't know much about this case and you shouldn't, at this point, but given how you feel about things and what you have been questioned about and informed of, can you say that, if it comes down to a question of life or death in this case, that your mind is as open to a life sentence[?] *Id.* at 114.

4.  Would you, in reaching your determination about the appropriate sentence to vote for, either life or death, be able to give fair consideration to mitigating circumstances? *Id.* at 124.

5.  So that, even though there may be evidence offered, or argued, as mitigation that you would still, bottom line, be considering a killing that was intentional, premeditated, and without any legal justification or excuse.

With this little lead up, can you tell me how you would feel about the death penalty as a punishment for that kind of crime, taking those things into consideration? *Id.* at 161-62.

6.　And would you choose the death penalty in every case of deliberate, premeditated, intentional murder for which there is no legal justification or excuse? *Id.* at 163.

From these questions, it is obvious that Richmond, although unable to specifically question jurors about the effect that his prior murder conviction would have on their sentencing decision, was allowed to question prospective jurors about their beliefs on the death penalty and ability to consider mitigating evidence irrespective of the facts and circumstances surrounding the murders of Ms. Hayes and her two children. Moreover, these questions are not the sort of "general fairness and 'follow the law' questions" that the Supreme Court found to be constitutionally deficient in *Morgan*, 504 U.S. at 734. Instead, they are the sort of questions that enable a capital defendant at *voir dire* to identify prospective jurors holding the misconception that "death should be imposed *ipso facto* upon conviction of a capital offense . . . regardless of the facts and circumstances of conviction." *Id.* at 735.

V.

Finally, we turn to Richmond's argument that the North Carolina Supreme Court's conclusion that he was not entitled to inform the jury of his parole ineligibility for his federal murder conviction is contrary to or an unreasonable application of the Supreme Court's holding in *Simmons v. South Carolina*, 512 U.S. 154 (1994).

A.

In *Simmons*, Justice O'Connor, whose concurring opinion we treat as controlling because it represents the narrowest grounds upon which the majority agreed,[10] concluded that "[w]here the State puts the

---

[10]Although Justice Blackmun authored the Court's plurality opinion, Justice O'Connor's concurring opinion is viewed as announcing the

defendant's future dangerousness in issue, and the only available alternative is life imprisonment without the possibility of parole, due process entitles the defendant to inform the capital sentencing jury—by either argument or instruction—that he is parole ineligible." *Id.* at 178 (O'Connor, J., concurring). Justice O'Connor rested her conclusion on the Court's precedent holding that "[w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, . . . the elemental due process requirement that a defendant not be sentenced to death on the basis of information which he had no opportunity to deny or explain [requires that the defendant be afforded an opportunity to introduce evidence on this point.]" *Id.* at 175 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 n.1 (1986)(internal quotation marks omitted)). Justice O'Connor also concluded, however, that a jury need not be informed of a defendant's parole ineligibility where the prosecution limits its argument of future dangerousness to the defendant's potential danger in prison. *Id.* at 177 ("Of course, in . . . cases [where the only alternative to death is life without parole] the prosecution is free to argue that the defendant would be dangerous in prison.").

Applying the holding in *Simmons*, the North Carolina Supreme Court held that Richmond was not entitled to a *Simmons* instruction because the State's arguments about his future dangerousness were limited to the danger he posed in prison to other inmates and staff. *Richmond*, 495 S.E.2d at 696. We conclude, however, that the State's arguments about Richmond's future dangerousness were not limited to the potential danger he posed in prison. Accordingly, we find that the North Carolina Supreme Court's application of *Simmons* was unreasonable.

---

Court's holding in *Simmons* because "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977)(quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)(opinion of Stewart, Powell, and Stevens, JJ.)); *see also Ramdass v. Angelone*, 187 F.3d 396, 403 (4th Cir. 1999)("We recognize Justice O'Connor's concurrence as the controlling opinion in *Simmons* because it represents the narrowest grounds upon which a majority of the Court agreed.").

In the very last thought it left the jury to ponder before beginning its sentencing deliberations, the State expressly put Richmond's future dangerousness in issue by stating:

> When you know that someone has killed not just once, Lisa Ann Nadeau, not just twice, H[e]lisa Hayes, not just three times, Darien Hayes, not just four times, Phillip Hayes. Four times, folks. What does it take? What does it take? *There is only one way you can ensure that this defendant does not kill again, and that is to impose the penalty that he has earned and worked for and deserves. I ask you to impose the death penalty on all three cases.*[11]

*Id.* (emphasis added). The North Carolina Supreme Court concluded that this statement, when read in context, solely placed in issue Richmond's future threat in prison. Specifically, the North Carolina Supreme Court reasoned that this statement was limited to Richmond's future threat in prison because it was made in close proximity to the State's arguments in opposition to two proposed mitigating factors: (1) that Richmond had exhibited good conduct in jail following his arrest and (2) that Richmond would adjust well to life in prison. *Id.* In so finding, the court noted that the State posed the following question to the jury in arguing against the proposition that Richmond would adjust well to life in jail: "[A]re you convinced [Richmond] won't kill in prison?" *Id.* The court also noted that the State, in arguing against the assertion that Richmond had exhibited good conduct since his incarceration, maintained that while Richmond "can control himself when he wants to control himself," *id.*, the "[p]roblem is, you and I can't be sure when he's going to want to and when he's not, even in a jail cell." *Id.* We find the North Carolina Supreme Court's

---

[11]In *Simmons*, the Court found that the State put the defendant's future dangerousness in issue by urging the jury to impose the death penalty because it would represent "'a response of society to someone who is a threat . . . [and] an act of self defense.'" 512 U.S. at 157 (Blackmun, J., plurality opinion)(quoting App. 110). In the present case, the State's closing argument had the same effect because it urged the jury to impose the death penalty, which Richmond "earned and worked for and deserve[d]," *Richmond*, 495 S.E.2d at 696, to "ensure that [Richmond] does not kill again." *Id.*

conclusion as to the limiting effect of these statements unreasonable for several reasons.

First, the State's comments purportedly attempting to limit its future dangerousness argument were very short—amounting to only two-thirds of a transcript page. J.A. 1123. Given the brevity of these comments, we find that they could not have had the limiting effect that the North Carolina Supreme Court gave them. Second, and more importantly, the State's references to Richmond's future threat in prison were solely made in connection with its arguments against the aforementioned mitigating factors, which one would expect given that the mitigating factors being opposed dealt only with Richmond's conduct in prison. Consequently, a jury hearing these arguments, which were not made immediately prior to the State's subsequent reference to Richmond's future dangerousness, would naturally conclude that they were made solely in opposition to the entirety of the aforementioned mitigating factors, and would not have viewed them as limiting the State's reference to Richmond's future dangerousness to his dangerousness in prison. Third, a close assessment of the State's argument in opposition to the contention that Richmond would adjust well to life in prison reveals that the State gave little value to the threat he posed in prison and actually placed Richmond's future threat outside of the prison context.

In urging the jury not to give mitigating value to the proposition that Richmond would adjust well to life in prison, the State argued: "Defendant would adjust well to prison life. You heard the evidence in this case. Are you convinced he won't kill in prison? Are you convinced he won't kill now? And whether he does or doesn't, what mitigating value does that have as to these crimes? None." *Id.* This latter statement clearly indicated to the jury that it should not consider Richmond's threat in prison when making its sentencing decision. Morever, by asking the jury, "Are you convinced Richmond won't kill now," the State clearly brought Richmond's future threat outside of the prison context and sought to make the jurors feel as if they could be Richmond's next victim. Likewise, a close assessment of the State's argument in opposition to Richmond's good conduct in prison as a mitigating factor reveals that the State actually limited Richmond's future threat in prison. In urging the jury not to give mitigating value to Richmond's good conduct in prison, the State expressly

stated: "Not sure how much trouble you can get into in jail. That's what they're there for." *Id.* This statement clearly implied to the jury that the only reason Richmond did not have any disciplinary infractions in prison was because he was unable to get into any trouble in prison. Thus, by making this statement, the State created the impression that Richmond's future dangerousness would be a concern outside, not within, the setting of incarceration. Further limiting Richmond's threat in prison was the State's argument that Richmond's good prison conduct "shows he can control himself. He's not out of control. He's not a raving maniac. He can control himself when he wants to control himself." *Id.*

The State argues that even if we find that Richmond's future dangerousness, as contemplated in *Simmons*, was put in issue during the sentencing phase of his trial, the North Carolina Supreme Court's application of *Simmons* was reasonable because a *Simmons* instruction is only required when a defendant is not eligible for parole under state law. We reject such a narrow reading of the holding in *Simmons*. While the Court in *Simmons* dealt directly with parole ineligibility under state law, the Court's holding in *Simmons* stands for the principle of law that elemental due process requires that capital defendants, once their future dangerousness outside of prison is put in issue, have the opportunity to inform the jury of their parole ineligibility irrespective of how it came about. We base our reading of *Simmons* on the fact that this is the one common theme throughout the separate opinions written by the Justices that joined the judgment in *Simmons*.[12] 512 U.S. at 169 (Blackmun, J., plurality opinion)("Because truthful information of parole ineligibility allows the defendant to 'deny or explain' the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court."); *id.* at 172 (Souter, J., concurring)("I join Justice BLACKMUN's opinion that, at least when future dangerousness is an issue in a capital sen-

---

[12]We reject the State's argument that our reading of *Simmons* constitutes a new constitutional rule of criminal procedure and thus is inapplicable to the present case under *Teague v. Lane*, 489 U.S. 288, 310 (1989)("Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.").

tencing determination, the defendant has a due process right to require that his sentencing jury be informed of his ineligibility for parole."); *id.* at 174 (Ginsburg, J., concurring)("To be full and fair, [a defendant's opportunity to rebut an argument of future dangerousness] must include the right to inform the jury, if it is indeed the case, that the defendant is ineligible for parole. JUSTICE BLACKMUN's opinion is in accord with JUSTICE O'CONNOR's on this essential point."); *id.* at 175 (O'Connor, J., concurring)("But '[w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, . . . the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain' [requires that the defendant be afforded an opportunity to introduce evidence on this point.]" (quoting *Skipper*, 476 U.S. at 5 n.1)).

B.

Although we find that Richmond was entitled to a *Simmons* instruction, we must now determine whether the trial court's failure to provide Richmond with a *Simmons* instruction constitutes harmless error under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Before conducting this inquiry, however, we note that the Tenth Circuit has recently called into question whether a *Simmons* violation is subject to *Brecht*'s harmless error analysis because the Supreme Court has never conducted such an analysis in the three cases where it has found a *Simmons* violation.[13] *Mollett v. Mullin*, 348 F.3d 902, 921 n.6 (10th Cir. 2003)("It is not entirely clear whether a *Simmons* error is subject to harmless error analysis . . . [given that] the Supreme Court has never performed a harmless error analysis in any of the three cases where the Court found a *Simmons* violation."); *id.* at 925 n.2 (Murphy, J., dissenting)("In light of the nature of the due process problem identified in *Simmons*, however, it is not surprising that the Court has never subjected such an error to a harmless-error analysis."). *But see O'Dell v. Netherland*, 95 F.3d 1214, 1239 n.5 (4th Cir. 1996)(*en banc*)(implying that *Brecht* harmless error analysis would be required if *Simmons* violation is found); *Johnson v. Gibson*, 254 F.3d 1155,

---

[13]The three cases in which the Supreme Court has found a *Simmons* violation are *Simmons*, 512 U.S. 154, *Shafer v. South Carolina*, 532 U.S. 36 (2001), and *Kelly v. South Carolina*, 534 U.S. 246 (2002).

1166-67 (10th Cir. 2001)(applying harmless error analysis to *Simmons* violation). However, because the Supreme Court has recognized that "most constitutional errors can be harmless," *Neder v. United States*, 527 U.S. 1, 8 (1999), and that "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis," *id.* (quoting *Rose v. Clark*, 478 U.S. 570, 579 (1986)(alteration omitted)), we deem it appropriate to conduct a *Brecht* analysis to determine whether the trial court's failure to provide Richmond with a *Simmons* instruction was harmless.

C.

In *Brecht*, the Supreme Court held that principles of comity and respect for state court judgments preclude federal courts from granting habeas relief to state prisoners for constitutional errors committed in state court absent a showing that the error "'had a substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In applying *Brecht*'s harmless error analysis, we must grant a habeas petition if we are in "grave doubt" as to the harmlessness of the error. *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002). "'Grave doubt' exists when, in light of the entire record, the matter is so evenly balanced that the court feels itself in 'virtual equipose' regarding the error's harmlessness." *Id.* In light of the facts and circumstances surrounding the murders of Ms. Hayes and her two children, we conclude that the trial court's *Simmons* error did not have a substantial and injurious effect or influence in determining the jury's sentencing decision and have no grave doubt as to the harmlessness of the trial court's *Simmons* error.

In making its sentencing decision, the jury was presented with a situation where it had found Richmond guilty of: (1) forcefully raping Ms. Hayes, his best friend's ex-wife, and strangling her to death while her eight-year-old son, Phillip, listened and watched; (2) grabbing Ms. Hayes' son and carrying him into the bathroom where he murdered him by stabbing him approximately forty times with scissors and wrapping an electrical cord five times around his neck; and (3) walking into the bedroom of Ms. Hayes' seven-year-old daughter, Darien,

who was sound asleep while he raped and murdered her mother and then proceeded to murder her brother, and strangled her to death with the cord from a curling iron. In addition, the jury had before it a situation where Richmond showed no remorse for his actions. After raping and murdering Ms. Hayes and murdering her two children, Richmond served as a pallbearer at their funerals and sought to shift police attention from himself and onto his best friend, Wayne Hayes. By purposely misleading police, Richmond caused Wayne Hayes, as well as Ms. Hayes' father, William Stewart, and her boyfriend at the time of the murders, Barrett Park, to endure the pain and stress of being considered a suspect in the murders of loved ones. Further illustrating Richmond's lack of remorse is the fact that he continued to deny that he murdered Ms. Hayes and her two children until he was informed that DNA evidence established that the semen found in Ms. Hayes' body was his. Lastly, the jury was confronted with a situation where it had been informed of the fact that Richmond had already been found guilty in federal court of strangling Ms. Nadeau to death with his bare hands, as he had done with Ms. Hayes. In light of these facts and circumstances, we find it highly unlikely that the jury, had it received a *Simmons* instruction, would have declined to sentence Richmond to death.

## VI.

We hold that Richmond's ineffective assistance of counsel claims were procedurally defaulted in state court pursuant to N.C. Gen. Stat. § 15A-1420(b)(1), an adequate and independent state procedural rule. Because Richmond does not argue that our failure to consider his claims will result in a "fundamental miscarriage of justice" and because Richmond has failed to establish cause to excuse his procedural default and prejudice therefrom, we are precluded from considering his ineffective assistance of counsel claims under the procedural default doctrine. We also hold that the North Carolina Supreme Court's adjudication of Richmond's *Morgan* claim was neither contrary to nor an unreasonable application of clearly established federal law. We do, however, hold that the North Carolina Supreme Court's adjudication of Richmond's *Simmons* claim constituted an unreasonable application of *Simmons* because Richmond's future dangerousness was put in issue and not limited to the threat he posed in prison. Nonetheless, we hold that Richmond is not entitled to habeas relief

on his *Simmons* claim because he is unable to show that the trial court's *Simmons* error was not harmless under *Brecht*.

Accordingly, we affirm the district court's denial of Richmond's habeas petition.

*AFFIRMED*